Filed 7/17/14  P. v. Aguirre CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065619 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1002816) |
| ERNESTO AGUIRRE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael A. Smith, Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Ernesto Aguirre guilty of first degree murder in violation of Penal Code section 187, subdivision (a), and found true the allegation that Aguirre personally used a firearm within the meaning of Penal Code section 12022.53, subdivision (b). The court sentenced Aguirre to an aggregate term of 50 years to life in prison.

On appeal, Aguirre contends the trial court abused its discretion and thus erred in denying his motion for new trial following his conviction because (1) of a statement made during the direct examination of a jailhouse informant elicited by the prosecution that Aguirre contends was unduly prejudicial and prevented him from receiving a fair trial; and (2) the court allegedly failed to weigh independently both the credibility of Jane Doe No. 1's identification of Aguirre as the shooter and the sufficiency of the evidence in support of the jury's finding he personally used a firearm during the commission of the offense.

As we explain, we disagree with these contentions and affirm the judgment of conviction.

FACTUAL AND PROCEDURAL OVERVIEW[1]

In early July 2010, victim Daniel Martinez sat with another man and a child inside a vehicle located in a drugstore parking lot in San Bernardino. Witness Abdul Sabr Abdullah saw a man later identified as Martinez walk from this vehicle, which Abdullah

---

1    We view the evidence in the light most favorable to the judgment of conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Portions of the factual and procedural history related to the contentions raised by Aguirre are discussed in detail *post*.

2

identified as a Jeep Cherokee, to a smaller car in the same parking lot. Abdullah testified he passed within a few feet of Martinez and his car as Abdullah went to pay a bill.

Abdullah testified he next saw a dark-colored Honda pull halfway into the driveway of the parking lot and stop about 20 feet away from Martinez's car. The Honda caught Abdulla's attention because its driver did not park in a marked stall. Instead, Abdullah saw a man, later identified by witness Jane Doe No. 1 as defendant Aguirre, exit the passenger side of the Honda, casually walk up to the car where Martinez had just entered and was partially sitting and shoot Martinez at point-blank range. According to Abdulla, the man was young, about 5' 5" tall and wore a dark-colored baseball hat, a hooded pullover and "baggy" shorts.

Abdullah heard six to nine shots in total. Initially, the man shot Martinez in the upper body, then went to the back of the side window of the car and fired about four more shots at Martinez. When the shooter turned around after the shooting, Abdullah saw he had "kind of a smile on his face." Abdullah next saw the shooter drop a weapon that had not been used in the shooting. After picking up that weapon, Abdullah watched the shooter move quickly to, and enter the passenger side of, the Honda. At that point, Abdullah saw the other man who had been sitting in the Cherokee get out of the car and fire three or four shots at the Honda as it fled the scene.

Mohammed Saheed Khan witnessed the shooting as he sat in his car waiting for Abdulla. Khan saw a black Honda parked. Next, he saw a man wearing a black hat walk up to another car and fire about six or seven shots at the victim. Khan also saw the shooter drop a gun after the shooting and then jump into the Honda. Khan testified a man

3

in a Jeep Cherokee parked nearby got out of his car and started shooting at the Honda as it sped off.

Witness Jose Garibo testified he was at a yard sale on the day of the shooting when he saw a black Honda "just c[o]me out of nowhere" and park across the street. Garibo saw two Hispanic males, both with shaved heads wearing shorts and white socks, get out of the Honda. Garibo next saw the man who had been sitting in the passenger side of the car take off a black shirt and grab "something" with it and run away.

Jane Doe No. 1, a minor, testified on the day of the shooting she came out of a fast food restaurant and saw a black Honda stopped at a stoplight about 10 feet away from where she came to stand on a street corner. As noted, Jane Doe No. 1 identified Aguirre as the passenger in the Honda. According to this witness, the passenger in the Honda was Hispanic, wore a black shirt and black hat and "had no facial hair," but instead was "shaved."

Jane Doe No. 1 saw the black Honda pull into the drugstore parking lot and then heard gunshots. Next, she saw the Honda "rush" out of the parking lot and stop and/or slow down for a few seconds, again about 10 feet from where she was then standing. Jane Doe No. 1 noticed there were now gunshots in the door on the passenger side of the Honda. Jane Doe No. 1 saw the same passenger in the Honda "looking around" and then the car sped off.

After the shooting, Jane Doe No. 1 picked out Aguirre from a photo lineup as the passenger she saw twice in the black Honda on the day of the shooting. Jane Doe No. 1 testified that she was "positive" that Aguirre was the passenger in that Honda. She based

4

her identification of Aguirre not on the fact he was the only individual wearing a black shirt in the photo lineup, but rather on the fact she recognized his face. Jane Doe No. 1 testified she saw the "front" of the face of the passenger in the black Honda the first time the car was stopped at the stoplight before the shooting and the "side" of his face the second time, when the car stopped and/or slowed down near her immediately after the shooting.

Jane Doe No. 2 testified that sometime between 11:30 a.m. and noon her cousin, defendant Aguirre, and another companion knocked on the front door of her home. Jane Doe No. 2 and her husband lived just a few houses away from where the police found the abandoned black Honda with the bullet holes. Jane Doe No. 2's husband answered the front door. Aguirre was wearing a dark hat. Concerned, Jane Doe No. 2 asked Aguirre what was happening. In response, he told her "I don't want to get you involved." Aguirre also told his cousin that the "hoodas" were either after him or were looking for him. Jane Doe No. 2 explained that the word "hoodas" was slang for "cops."

Jane Doe No. 2 testified Aguirre's companion offered to pay $20 for a ride. Jane Doe No. 2 noticed Aguirre did not have his car, although she knew he had a car. Jane Doe No. 2 did not invite Aguirre and his companion into her home, but instead asked Aguirre if he had any guns on him, to which Aguirre replied, "No." Jane Doe No. 2 saw both men get picked up by a car after Aguirre told her their ride was "on its way."

5

DISCUSSION

I

As noted, Aguirre contends the court abused its discretion and thus erred when it denied his new trial motion after the prosecution elicited an inadmissible statement from jailhouse informant and (former) gang member Jason Atkins.

A. *Additional Background*

Shortly before trial commenced, the People identified Atkins as a new witness. Atkins previously had been merely a confidential informant but was contemplating coming forward and testifying in Aguirre's trial regarding an alleged conversation that took place while they were both in custody. The People noted Atkins had been convicted in an unrelated case and faced an indeterminate sentence as a result of the "Three Strikes" law. In return for testifying truthfully in the instant case (as determined by the court), the People further noted Atkins hoped for, but there was no guarantee of, leniency at his sentencing.

As then noted by the trial court, Atkins proposed to testify that he was a member of the West Side Verdugo gang; that a person named "Lazy" was a "shot caller for this gang"; and that Aguirre "asked Mr. Atkins to get a message to Lazy that was, and obviously it was in slang or jargon, which the witness, based on his experience with the gang, understood to mean that the defendant was asking the witness, Mr. Atkins, to tell Lazy that there was only one witness against him, and basically something needed to be done with that witness."

6

The record shows the defense objected to Atkins's proposed testimony, contending it was unreliable, turned the case into a "gang case" and was being raised on the eve of trial. The court in response noted that it could hold an Evidence Code section 402 hearing on what was said and Atkins's understanding of the meaning of what was said; that if Atkins was permitted to testify the court would give the defense additional time "to prepare to meet that testimony, and to perhaps adjust any other defense strategy"; and that the defense's concern regarding sentence leniency and any similar issues involving Atkins "certainly raise[d] issues as to the credibility" of this witness, but was "something for a jury to determine." The court preliminarily found, however, that Atkins's testimony was "at least potentially probative" as either an "admission or statements that could be argued [to] show a consciousness of guilt."

The record shows that after granting the defense's request for a short trial continuance, an Evidence Code section 402 hearing was conducted in connection with Atkins's proposed testimony. At the conclusion of that hearing, the court ruled Atkins could testify about the conversation where Aguirre allegedly said, " 'Without this witness coming forward they would have nothing on me, so tell Lazy, what's up?' " In making its decision, the court noted Atkins had been a member of the West Side Verdugo gang for 16 years and thus was familiar with the gang language and culture to provide testimony regarding this statement and his understanding of the meaning of this statement. The court also noted this statement, if the jury determined it was in fact said, was "highly probative" and a "demonstration of consciousness of guilt."

7

The court also ruled, however, that Atkins could not testify he told Aguirre he "appreciated what the defendant did for the neighborhood, that if the defendant hadn't done that, the neighborhood would have been in trouble or had problems or had a green light on them," noting these statements were hearsay and thus "clearly not admissible."

At trial, Atkins testified he was a member of the West Side Verdugo street gang; that he had been a member of that gang for about 16 years; that he was a member of the "Little Counts" clique; that the president of West Side Verdugo and the Little Counts clique was a person who went by the moniker "Lazy"; that in light of his testimony, he was now "marked for death" by the gang and thus was in protective custody; and that since his incarceration, he had about four or five contacts with Aguirre.

Specifically, Atkins testified he introduced himself to Aguirre in the recreation yard of the jail as a member of the West Side Verdugo gang who went by the moniker "Hoax." Aguirre in response shook Atkins's hand and introduced himself as "Gaucho" from the same gang. Atkins said he sent a "kite," which he described as a handwritten letter or note that is sent from one person to another, to his "homies" in the jail asking them to acknowledge their fellow gang member Aguirre and letting Aguirre know they were there to help out with "hygiene," food or anything else Aguirre needed. Atkins said he did this because Aguirre told Atkins he "wasn't feeling the love" from his fellow gang members.

Atkins also testified to a conversation with Aguirre in the courthouse when both were appearing in their respective matters. During this conversation Atkins asked Aguirre if he wanted to become a member of the Little Counts clique. Atkins said he had

8

the authority to make that offer from Lazy, the president. Aguirre, however, declined the offer and said he was now a Christian. In response to Atkins's question how his case was going, Aguirre told him during this same conversation "it was good going. That they had nothing against him except for a family member that was coming forward. And, without her, that they would have nothing. [¶] So he [i.e., Aguirre] told me to tell Lazy, 'What's up? If he could take care of that for him.' " Atkins testified he found Aguirre's request peculiar because "if you're a Christian, you're not going to put something out there that's telling another person to ask for a goal, to make a hit on somebody, or to take care of a witness from coming forward. [¶] Being a Christian means that you're walking with the Lord, that everything you do is Christ-like."

In response to the question why it was important to tell Lazy what Aguirre said, Atkins testified that Lazy "being the president, he's able to keep somebody from coming forward. He could send people after that witness, or after the person that he said was testifying against him." Atkins said Aguirre told him the name of the witness but he could not remember it at the time of trial, although he believed it was either an aunt or a cousin. Aguirre admitted the phrase "What's up?" had different meanings but stated he interpreted the phrase as used by Aguirre to mean that the gang should "take care of that person" so she did not appear as a witness in Aguirre's case.

As relevant here, the record shows the prosecutor next asked Atkins why he wanted Aguirre to join Little Counts. The following colloquy then took place:

"[Atkins]: My reason was because, I mean, he [i.e., Aguirre] sacrificed the ultimate for us. He showed me that he had—

9

"THE COURT:  Sustained.

"[Defense Counsel]:  Move to strike.

"THE COURT:  The last answer is stricken.

"[Prosecutor]:  Did you want to bring the defendant back to West Side Verdugo?

"[Atkins]:  Yes.

"[Prosecutor]:  And that was your goal?

"[Atkins]:  Yes."

Atkins also testified he accepted a plea of 36 years to life in prison but that the court would consider his testimony in the instant case at his sentencing; that he was not promised a certain number; that he came forward, despite being marked for death, because his mother recently had passed away and he has two children, one of which he has never touched; and that he realized that "everything that [he] did for [his] neighborhood counted for nothing" and he wanted to find peace.

At the next break in the proceedings and outside the presence of the jury, the defense moved for a mistrial, contending Atkins's statement that Aguirre "sacrificed the ultimate for us" was hearsay, as previously ruled on and excluded by the court during the Evidence Code section 402 hearing, and was unduly prejudicial.  The court denied the motion, ruling as follows:

"The question is whether or not there was prejudice as a result of it [i.e., the statement by Atkins].  And, given that the objection was made promptly when the witness started to answer, the Court did sustain the objection, the Court did instruct the jury to disregard it, I really—and there's no specific reference to this particular incident [i.e., the

10

killing of victim Martinez], It would be sheer speculation as to what it was he was referring to.  [¶]  I really don't see that there's prejudice that would justify either a mistrial or a dismissal at this time."

The record shows the defense refused, ostensibly for tactical reasons, the court's offer to admonish the jury generally that if Atkins "made references to anything he heard, or rumors, that that's not reliable, and it's not to be considered."  The defense also rejected the court's offer to give a more specific admonition, when the proceedings commenced or at the conclusion of Atkins's testimony or at the end of the case when instructing the jury.

Following his first degree murder conviction, Aguirre moved for a new trial on myriad grounds including as relevant here, alleged prosecutorial misconduct.  At the hearing on that motion, the trial court noted that the prosecutor during the Evidence Code section 402 hearing asked Atkins a question that was similar to the one asked of him during the trial; that the court at the conclusion of the Evidence Code section 402 hearing excluded Atkins's response to this question—that Aguirre made the "ultimate sacrifice" for the gang, or words to that effect—and specifically told counsel if either side sought to admit this testimony at trial it should first apprise the court outside the presence of the jury; and that in response to the similar question at trial, Aguirre began to give similar testimony previously deemed inadmissible by the court.

The court thus concluded the prosecutor engaged in misconduct when she asked Aguirre this question in front of the jury because it was likely to elicit a response from Atkins that the court already ruled was inadmissible.  The court next turned to the issue of prejudice.  It noted Atkins was just beginning to answer this question when an

11

objection interrupted his response, which the court sustained.  It further noted the jury was immediately instructed to disregard Atkins's incomplete response.  As such, the court found the inference the jury is presumed to follow a court's admonitions "much stronger" in the instant case than in a typical case.

The court further analyzed the issue of prejudice as follows:

"The question to be asked is whether or not it's reasonably probable that if that question had not been asked there would be a result more favorable to the defendant.  And the Court concludes that it is not reasonably probable that a result more favorable to the defendant would have been made, but for that question.

"The answer was interrupted.  The so-called 'ultimate sacrifice' was never explained.  As pointed out by [the prosecutor], it was never referred to either directly or indirectly in any further evidence or testimony, was not referred to either directly or indirectly in any of the arguments.

"So, the Court finds that [the] misconduct was harmless."

B. *Guiding Principles and Analysis*

It is axiomatic that a court has broad discretion when ruling on a new trial motion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1159, overruled in part on another ground as stated in *People v. Rundle* (2008) 43 Cal.4th 76, 151, overruled in part on another ground as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  A court's ruling will not be disturbed " ' "unless a manifest and unmistakable abuse of discretion clearly appears." ' "  (*Id.* at p. 1160.)

12

A prosecutor's misconduct and/or an improper statement volunteered by a witness, as in the instant case, justifies a mistrial when the trial court finds the incident is incurably prejudicial, such that it has irreparably damaged the defendant's chance of receiving a fair trial. (*People v. Dement* (2011) 53 Cal.4th 1, 39.) "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)

Here, the record shows the statement by Atkins that Aguirre "sacrificed the ultimate for us" was brief. Indeed, the record shows the trial court sustained an objection to this statement mid-sentence, as Atkins was in the process of answering the prosecutor's question why he invited Aguirre to join Little Counts, without giving Atkins an opportunity to explain what he meant by it. In addition, the record shows this statement was not referenced again either in testimony or in argument.

Moreover, the statement was made without regard to the killing of Martinez, as noted by the trial court, which thus led it to find the statement in that context was ambiguous and any attempt to subscribe a certain meaning or understanding to it would be speculative.

Aguirre contends Atkins's statement that Aguirre "sacrificed the ultimate" for the gang was extremely prejudicial because it injected gang elements in the case where none previously existed and because "it implied his [i.e., Aguirre's] direct commission of the murder *more than* any other evidence presented." (Italics added.)

13

While it is true that Atkins's testimony *generally* injected gang elements into the case, we note that much of this evidence is not challenged on appeal by Aguirre, including the testimony by Atkins that Aguirre went by the moniker Gaucho and was a member of the West Side Verdugo; that Aguirre asked Atkins to tell Lazy, the president of both the Little Counts and the West Side Verdugo gang, "What's up?" and if Lazy could "take care of that for him" after telling Atkins that his case was going well and the police "had nothing against him except for a family member that was coming forward"; and that Atkins sent a "kite" to his "homies" to let them know that Aguirre was not "feeling the love" as a result of his membership in the West Side Verdugo gang. We thus disagree with Aguirre that he was prejudiced by the alleged improper statement by Atkins because that statement injected gang evidence into a case where there allegedly was none.

We also disagree with Aguirre's contention that the alleged improper statement by Atkins that Aguirre "sacrificed the ultimate" for the gang was unduly prejudicial because it allegedly was the most persuasive evidence that Aguirre in fact was involved in the killing. Equally, if not more prejudicial, however, was the testimony that Aguirre does *not* challenge on appeal regarding what occurred in the courthouse, as described and interpreted by Atkins, when Aguirre asked Atkins if he could tell Lazy, "What's up?" and if Lazy could take care of what Aguirre ostensibly believed was the only witness against him (i.e., his cousin, Jane Doe No. 2). In our view, this unchallenged evidence alone diluted the potential for prejudice arising from Atkins's brief, ambiguous statement that Aguirre "sacrificed the ultimate" for the gang. Under the circumstances, the trial court was within its broad discretion in concluding that this statement by Atkins was not

14

incurably prejudicial.  (*People v. Collins* (2010) 49 Cal.4th 175, 199 [rejecting mistrial claim where volunteered testimony was "brief and ambiguous"].)

What's more, the record shows Jane Doe No. 1 positively identified Aguirre as the passenger in the Honda that was involved in the shooting.  She testified that before the shooting she stood on a street corner about 10 feet away from a man wearing a black hat who was a passenger in a black Honda that was stopped at a stoplight.  She further testified she saw the same car pull into the drugstore parking lot, heard gunshots and then saw the black Honda "rush" out of the parking lot and stop and/or slow down again about 10 feet from where she was then standing.  At that point, Jane Doe No. 1 noticed for the first time bullet holes in the passenger side door of the Honda.  According to Jane Doe No. 1, the passenger in that car was "looking around" before the car sped away.  Jane Doe No. 1 positively identified Aguirre from a photo lineup as the passenger in the black Honda.

In denying the mistrial motion for alleged lack of sufficiency of the evidence, the record shows the trial court found the testimony of Jane Doe No. 1 "standing alone" was sufficient to support the guilty verdict against Aguirre.

But that's not all.  Jane Doe No. 2 testified that Aguirre was her cousin and that sometime between 11:30 a.m. and noon on the day of the shooting Aguirre and a companion unexpectedly arrived at the home she shared with her husband, which the record shows was located just a few houses away from where police found the abandoned black Honda (with bullet holes).  Jane Doe No. 2 testified Aguirre's companion offered

15

$20 for a ride. Concerned for her cousin, Jane Doe No. 2 asked Aguirre, who was wearing a dark hat, what was happening. In response, he told her, "I don't want to get you involved" and added the "hoodas" were either looking for or after him. Jane Doe No. 2 said "hooda" was slang for cops.

In addition, although Abdullah could not identify Aguirre as the shooter, he saw a dark-colored vehicle he described as a Honda pull into the drugstore parking lot and stop about 20 feet from where he was walking. According to Abdullah, a man wearing a dark hat and baggy pants exited the passenger side of the Honda, casually walked up to the vehicle just entered by the victim and shot the victim multiple times. Abdullah then saw the man return to, and enter the passenger side of, the Honda. At that point, Abdullah saw a man in another vehicle located nearby, who had been with the victim just before he was killed, get out of his Jeep Cherokee and fire several shots at the Honda as it fled the scene. Khan, who had driven Abdullah that morning to the location where the shooting occurred, corroborated Abdullah's testimony that a man wearing a black hat got out of the passenger side of a black Honda, walked up to another car where the victim was located and fired about six or seven shots at the victim.

The record also shows the court, while instructing the jury before it began deliberations, admonished it that if any testimony was stricken from the record, the jury was required to "disregard it completely" and not consider it "for any purpose" and if an objection to a question was sustained, the jury was required to "ignore the question." (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 292 [rejecting mistrial claim where problematic testimony was struck and the jury properly admonished].) We

16

presume the jury was capable of following what we consider were clear and straightforward instructions by the trial court in this case and we note there is nothing in the record to rebut this presumption. (See *People v. Homick* (2012) 55 Cal.4th 816, 879 [noting a court presumes the jury followed the instruction not to consider a codefendant's extrajudicial statement].)

We therefore conclude on this record the trial court properly exercised its broad discretion when it denied Aguirre's motion for new trial following the guilty verdict. Under the circumstances, even assuming the prosecutor committed misconduct by asking Atkins the question that elicited the improper statement, we conclude Aguirre was not prejudiced by Atkins's brief and ambiguous response.

However, even if the court erred in denying Aguirre's new trial motion when it found Aguirre was not prejudiced from the fleeting and ambiguous statement made by Atkins, we further conclude, based on the overwhelming evidence of guilt summarized *ante*, that error was harmless under any standard of review. (See *Chapman v. California* (1967) 386 U.S.18, 23-24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

II

Aguirre next contends the court abused its broad discretion in denying his new trial motion because it allegedly failed to weigh independently the credibility of Jane Doe No. 1's identification of him as the gunman.

" 'In reviewing a motion for a new trial, the trial court must weigh the evidence independently. [Citation.] It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court

17

"should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 729-730.)

Here, as noted *ante* the record shows the trial court independently weighed the evidence, including the testimony proffered by Jane Doe No. 1, and found it sufficiently credible to support the jury's verdict. Indeed, the record shows that in support of the verdict the court found Jane Doe No. 1 positively identified Aguirre as the passenger in the black Honda that was involved in the shooting; that in making this identification, Jane Doe No. 1 used a diagram and a photograph to show where "she was and where the shooter was on two separate occasions when she made an identification of the shooter, showing her line of sight, showing the distance, which was a relatively close distance of about 10 to 12 feet," and the views of the shooter's face in both instances. Thus, the court concluded that based on this testimony alone, there was sufficient, credible evidence to support the verdict.

The trial court also relied on the testimony of Jane Doe No. 2, Aguirre's cousin. It noted her testimony, "in conjunction with the other evidence, in terms of where, the description of the vehicle that the shooter was in, the location, the direction that the shooter fled in the vehicle, and then a vehicle and the defendant arriving at a location and arriving at the defendant's cousin's house, and statements made by the defendant at his cousin's house, certainly supported an inference that he was at least involved in the shooting incident."

18

The court also found the testimony of witnesses Abdullah and Khan persuasive in denying Aguirre's new trial motion. Significantly, the court noted, and the record shows, that although neither witness made an actual identification of Aguirre as the shooter, "their testimony does support the identification that was made [by Jane Doe No. 1], and supports the inference to be drawn from Jane Doe No. 2's testimony." That is, both Abdullah and Khan testified they saw the *passenger* in the black Honda got out of that car after it came to an abrupt stop in the drugstore parking lot, walk up to the victim as he sat in his own car, and fire multiple shots at point-blank range at the victim.

We thus conclude the trial court did not abuse its discretion, much less clearly and unmistakably (see *People v. Davis* (1995) 10 Cal.4th 463, 524), when it found "that there is, having initially weighed the evidence and independently considering the evidence after independently weighing it," "substantial evidence to support the jury's verdict. And if it were a court trial, the Court would be compelled to reach the same conclusion as the jury."

## DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

HALLER, J.

McDONALD, J.

19